WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ASARCO, Inc., a New Jersey Corporation,)<br>)<br>Plaintiff,            )<br>)<br>vs.                       )<br>)<br>Union Pacific Railroad Company, a Utah)<br>Corporation,                )<br>)<br>Defendant.         )<br>)<br>_____) | No. CV 04-2144-PHX-SRB<br><br>**OPINION AND ORDER** |

        This action concerns the environmental cleanup of a parcel of land ("the Site") owned at various times by Plaintiff ASARCO, Inc. and Defendant Union Pacific Railroad Company. Plaintiff, pursuant to an agreement with the Nebraska Department of Environmental Quality ("NDEQ") expended nearly $30 million to decontaminate the Site, and now seeks contribution from Defendant for its share of the cleanup costs, pursuant to Section 113(f)(3)(B) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9613(f)(3)(B), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA").  At issue is a motion for summary judgment filed by Defendant which argues that the agreement between Plaintiff and NDEQ fails to meet the statutory requirements of a "settlement" within the meaning of Section 113(f)(3)(B), and therefore, does not entitle Plaintiff to seek contribution from Defendant (Doc. 27).  For the reasons that follow, Defendant's motion is granted.

1    **I.      BACKGROUND**[1]

2         From 1863 to 1946, Defendant owned the Site, a 22.4 acre parcel of land in Omaha,

3    Nebraska located near the Missouri River.  Initially, Defendant filled the Site with several

4    hazardous substances, as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), "to

5    enhance the [Site's] developability."  (Compl. at 4.)  From 1870 to 1890, Defendant leased

6    the Site to various companies, all of whom operated a lead smelter on the Site.  From 1899

7    to 1946, Defendant leased the Site to American Smelting and Refining Company (which later

8    became Plaintiff ASARCO, Inc.) which operated a lead smelter and lead refinery on the Site,

9    and also processed lead scrap during the later years of the lease.  In 1946, Plaintiff bought

10   the Site and continued to use it until 1997, when all operations ceased.

11        At some point prior to the Site's closure, Plaintiff made a decision to voluntarily clean

12   up the Site, in the manner prescribed by Nebraska law.  On December 22, 1995, Plaintiff

13   submitted to NDEQ, in accordance with Nebraska's Remedial Action Plan Monitoring Act

14   ("RAPMA"), a remedial action plan and other documentation required by the statute,

15   including:

16             2. . . . documentation regarding the land pollution or water pollution

17             site . . . ;

18             3. . . . a plan for the proposed project, including project monitoring

19             reports, appropriate engineering, scientific, and financial feasibility

20             data, and other data and information that may be required by the

21             department.

22   Neb. Rev. Stat. ("N.R.S.") § 81-15, 184 (1994).  Plaintiff also was required under the Act to

23   "[d]emonstrate that the remedial action plan conforms with federal Environmental Protection

24   Agency standards.  However, nothing in this subdivision shall be construed to require that

25   the department make any determination that such plan conforms with such standards."  *Id.*

26

27   ────────────────

28        [1]The following facts are undisputed, except where specifically noted.

1    RAPMA essentially authorizes certain Nebraska state agencies (one of which is
2    NDEQ), following receipt of the above-quoted materials, and after the performance of
3    additional investigation by the state agency, *see id.* at 185, to enter into agreements to
4    oversee the implementation of the submitted remedial action plan. *Id.*

5    Plaintiff and NDEQ entered into such an agreement on June 24, 1996, which was
6    entitled "Memorandum of Agreement" ("MOA"). (Pl.'s Controverting Statement of Material
7    Facts in Supp. of Pl.'s Opp'n to Mot. for Summ. J. ("PCSOF"), Ex. 2 ("MOA").) The MOA
8    states that NDEQ derives its authority to enter into the agreement from RAPMA and another
9    Nebraska law, the Nebraska Environmental Protection Act, Neb. Rev. Stat. § 81-1501 *et seq.*
10   (1994) (MOA at 1.) Further, in a similar vein, the MOA notes that "Asarco shall perform all
11   work conducted pursuant to this Agreement and any approved Work Plans in accordance
12   with the requirements of applicable state laws and regulations." (MOA, ¶ 17.)

13   The stated goal of the agreement is "to protect public health and welfare and the
14   environment from releases or threatened releases of pollutants from the Site." (MOA, ¶ 11.)
15   Also, "[t]he intent of this Agreement is to allow Asarco to conduct the remedial activities in
16   a detailed remedial action work plan . . . and to be implemented with oversight from the
17   DEQ." (MOA, ¶ 9.)

18   In the MOA, Plaintiff agreed to create and submit to NDEQ for approval, a remedial
19   action work plan ("RAWP") setting forth the "specific activities to be undertaken to
20   implement the components generally identified in the Remedial Action Plan." (MOA, ¶
21   13(a).) Plaintiff also agreed to submit to NDEQ, in accordance with the MOA, a "Post-
22   Remediation Operation and Maintenance Plan, that describes post-remediation operation and
23   maintenance activities that will be necessary to maintain and preserve the remediation
24   measures which are to be implemented." (MOA, ¶ 13(a).)

25   Plaintiff complied with both of these obligations. It submitted the proposed RAWP
26   to NDEQ, which responded with comments, some of which were presumably incorporated
27   into the Revised RAWP ("RRAWP"). The RRAWP was ultimately implemented with
28   NDEQ oversight.

1    Plaintiff also submitted the RAWP to the United States Environmental Protection

2 Agency ("EPA"), though the MOA does not appear to have required it to do so.  The EPA

3 responded on October 2, 1996 with "comments" about the RAWP.  (PCSOF, Ex. 20.)  Other

4 than commenting on the RAWP, the Court has before it no other evidence pertaining to the

5 EPA's role in the formulation or implementation of the RAWP or RRAWP.

6    The only other interaction the EPA appears to have had with the Site's cleanup came

7 in response to a letter from the Mayor of Omaha dated March 11, 1998.  In that letter, the

8 Mayor requested "clarification from the [EPA] on its position with respect to the proposed

9 voluntary remediation of [the Site]."  (PCSOF, Ex. 21.)  The impetus for that letter appears

10 to have been an inquiry made by the EPA to the United States Fish and Wildlife Service

11 ("USFWS") concerning the conditions of the Missouri River.  (PCSOF, Ex. 21.)  According

12 to the Mayor's letter, the USFWS responded to the EPA's inquiry by recommending "further

13 data collection in connection with Asarco's remediation."  (PCSOF, Ex. 21.)  The Mayor

14 expressed his worry that the EPA would become involved, thereby preventing the

15 remediation from proceeding as planned.  (PCSOF, Ex. 21.)

16    The EPA responded by confirming that it did plan to collect water and sediment

17 samples from the Missouri River, and perform chemical analyses to determine the toxicity

18 of those samples.  (PCSOF, Ex. 22.)  However, "[i]f the samples show that the contaminants

19 present no threat to the river organisms, no further action by the [EPA, USFWS and United

20 States Geological Survey] is anticipated."  (PCSOF, Ex. 22.)  There is no evidence in the

21 record that the results of the toxicity tests lead to further involvement by any federal agency.

22 Additionally, the letter states,

23    In accordance with their respective statutory authorities, both NDEQ

24    and EPA have looked and will continue to look to ASARCO to remedy

25    any problems resulting from their operations at the site.  Further, we

26    want to emphasize that NDEQ is in the lead for on-site remedial

27    activities pursuant to the RAMPA [sic] authority.  We will continue to

28

1          provide to NDEQ the technical assistance they request in support of this

2          effort.

3  (PCSOF, Ex. 22.)

4       Several other aspects of the MOA bear mention.  First, the MOA contains a promise

5  by NDEQ to issue to Plaintiff, upon the completion of its obligations under the MOA and

6  upon the transfer of the Site to the City of Omaha, a No Further Action ("NFA") Letter.

7  (MOA, ¶ 32.)  NDEQ's authority for this promise was drawn from a provision of RAPMA,

8  which authorizes state agencies overseeing the implementation of remedial action plans to

9  issue, upon completion of such plans,

10          a letter stating that no further action need be taken at the site related to

11          any contamination for which remedial action has been taken in

12          accordance with the approved remedial action plan.  Such letter shall

13          provide that the department may require the person to conduct

14          additional remediation action in the event that any monitoring

15          conducted at or near the real property or other circumstances indicate

16          (1) contamination is reoccurring, (2) additional contamination is present

17          which was not identified [in the approved remedial action plan], or (3)

18          additional contamination is present for which remedial action was not

19          taken according to the remedial action plan.

20  N.R.S. § 81-15, 186 (1994).

21       In addition to the substantive provisions contained in this section of RAPMA, the

22  MOA states that the NFA Letter "may be rescinded upon receipt of evidence by the DEQ that

23  the City of Omaha fails to adopt and enforce adequate institutional controls for the Site to

24  preserve the remediation."  (MOA, ¶ 32.)[2]

25

26

---

27      [2]Following its fulfillment of the terms of the MOA, Plaintiff agreed to transfer

28  ownership of the Site to the City of Omaha "for use as a park or other public space in
perpetuity."  (MOA, ¶ 10.)

1    Relatedly, the MOA elsewhere provides, in a paragraph entitled, "Effect of
2  Agreement" that,

3         This Agreement does not constitute a waiver, suspension, or
4         modification of any requirements of state or federal law or regulation,
5         which remain in full force and effect. Nothing in this Agreement,
6         including any document the DEQ issues as agreed to above, shall be
7         interpreted to constitute a release or waiver of liability from any of the
8         conditions which existed before, during, or after the DEQ's execution
9         of this Agreement or limitation of the DEQ's authority to respond to
10        such conditions, except as may be provided by the issuance of a No
11        Further Action letter . . .

12  (MOA, ¶ 29.)  Neither the MOA nor the NFA Letter make any reference to a waiver or
13  resolution of Plaintiff's liability under CERCLA law, nor do either of these documents appear
14  to even contain that acronym.  The only mention of federal law generally appears to be one
15  sentence in the MOA which states, pursuant to RAPMA, N.R.S. § 81-15, 184, that "[t]he
16  Work Plan shall demonstrate how these activities will conform with federal [EPA]
17  standards."  (MOA, ¶ 13(a).)  However, there is no evidence that NDEQ made a
18  determination that the RRAWP conformed with EPA standards, nor does RAPMA require
19  NDEQ to have done so. *See* N.R.S. § 81-15, 184.

20     On October 11, 2001, following Plaintiff's completion of its obligations under the
21  MOA, NDEQ issued to Plaintiff, as promised, an NFA letter. (PCSOF, Ex. 3.)  The letter,
22  in accordance with the terms of the MOA, reiterates that, while no further action was
23  presently required of Plaintiff, NDEQ retained the capacity to rescind the letter if the City
24  of Omaha fails to take proper measures to preserve the remediation performed by Plaintiff,
25  "fails to maintain the Site for its designated use, or takes an action which is incompatible
26  with its designated use," as well as for other reasons including the discovery of recurring
27  contamination at the Site, additional contamination at the Site not identified in the RRAWP,

28

1  or contamination at the Site that should have been, but was not, removed in accordance with

2  the RRAWP.  (PCSOF, Ex. 3 at 2.)

3         The MOA also contains termination provisions.  Plaintiff had the ability to unilaterally

4  withdraw from the MOA if it determined "that it is no longer feasible or desirable to continue

5  with the Agreement; or . . . ownership of the Site is not transferred to [the City of Omaha]."

6  (MOA, ¶ 27(b).)  Upon withdrawal, the agreement requires Plaintiff to "(i) submit all data

7  required by the Work Plan . . . ; (ii) submit payment of Final Costs to the DEQ; and (iii)

8  ensure that the Site does not present as a result of Asarco's actions pursuant to the Agreement

9  an imminent and substantial endangerment to the public health and welfare or the

10  environment necessitating emergency action."  (MOA, ¶ 28(b).)  The MOA permits NDEQ

11  to terminate the agreement only if:

12           (i) Asarco violates any terms or fails to meet its obligations under this

13           Agreement in a timely manner;

14           (ii) the Site presents an imminent and substantial endangerment to the

15           public health and welfare or the environment necessitating emergency

16           action; or

17           (iii) ownership of the Site is not transferred to the City of Omaha . . . "

18           Prior to termination for the reasons set forth in (iii) above, the DEQ

19           shall provide ASARCO the opportunity to submit an amended Work

20           Plan for the additional work deemed necessary  and to amend this

21           Agreement.

22  (MOA, ¶ 27(a).)  Finally, the MOA states that it "shall be binding on each Party . . . subject

23  to the right of termination above."  (MOA, ¶ 36.)

24         As mentioned above, Plaintiff fulfilled the terms of the MOA, and NDEQ issued the

25  NFA Letter.  Next, Plaintiff initiated the task of recouping some of its expenses by filing a

26  complaint in this Court on October 12, 2004, naming only Defendant, a potentially

27  responsible party ("PRP").  The Complaint contained three causes of action: the first was for

28  cost recovery under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), the second was for

1    contribution under Section 113(f)(1) and 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(1),

2    (3)(B), and the third was for a declaratory judgment under 28 U.S.C. § 2201.

3        On December 13, 2004, the United States Supreme Court issued its opinion in *Cooper*

4    *Industries, Inc. v. Aviall Services, Inc.,* 543 U.S. 157, 125 S. Ct. 577 (2004), a case which had

5    a significant impact on the present action.  On January 14, 2005, Defendant filed a motion

6    to dismiss the entire Complaint with the exception of Plaintiff's Section 113(f)(3)(B) claim

7    (Doc. 8).  In response, Plaintiff agreed to the dismissal of its Section 113(f)(1) claim,

8    presumably due to the holding in *Aviall.*  (Doc. 11.)  The Court dismissed Plaintiff's Section

9    107(a) claim, as even after *Aviall*, one PRP cannot maintain an action for cost recovery

10   against another PRP under Section 107(a).[3]  The Court also dismissed Plaintiff's request for

11

12       [3]It is worth noting that at no point has Plaintiff, unlike other similarly situated PRPs
13   who have conducted voluntary cleanups, argued that Section 107(a) contains an implied right
     of contribution which may serve as a basis for one PRP to maintain an action against another.
14   *See Aggio v. Aggio,* 2005 WL 2277037, at *5-6 (N.D. Cal. Sept. 19, 2005) (holding that,
15   even post-*Aviall,* "a PRP has an implied right to seek contribution under § 107(a)") (citing
     *Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298 (9th Cir. 1997)); *Koutrous v.*
16   *Goss-Jewett Co. of Northern Cal., Inc.,* 2005 WL 1417152 (E.D. Cal. June 16, 2005); *Adobe*
     *Lumber, Inc. v. Taecker,* 2005 WL 1367065 (E.D. Cal. May 24, 2005); *Ferguson v. Arcata*
17   *Redwood Co., LLC,* 2005 WL 1869445 (N. D. Cal. Aug. 5, 2005).  Rather, Plaintiff has
18   confined its Section 107(a) claim to cost recovery, a remedy that courts appear to have
     uniformly disallowed both before and after *Aviall.  See* Court's Order dated April 15, 2005
19   (Doc. 15).
         Of course, one of the critical distinctions between a "cost recovery" action and one
20   for "contribution" is that whereas the former enables the plaintiff to hold the defendants
21   jointly and severally liable for the entire amount of the cleanup costs (regardless of the
     plaintiff's own fault in causing the environmental damage), the latter enables the plaintiff to
22   hold the defendants responsible only for the damage that they actually caused.  *See*
23   *California ex rel. Cal. Dept. of Toxic Substances Control v. Neville Chem. Co.,* 358 F.3d 661,
     672 (9th Cir. 2004) (noting that "suits for contribution . . . are entirely distinct under the
24   statute from suits for recovery of costs.").  *See, e.g., Aggio,* 2005 WL 2277037, at *5-6
25   (recognizing the distinction between a claim for "cost recovery" and one for "contribution"
     ); *Koutrous,* 2005 WL 1417152, at *1-4 (same).  This distinction is one of which Plaintiff
26   appears to have been well aware throughout the pendency of this litigation.  *See* Compl. ¶ 34
27   (alleging, in its claim under Section 107(a), that "Defendant is strictly liable for Plaintiff's
     costs of response, removal, and remedial action.").  *See also* Pl.'s Opp'n to Def.'s Mot. to
28   Dismiss at 4-9.

1  declaratory relief.  At issue in the instant Order is the last remaining cause of action in the

2  Complaint:  Plaintiff's contribution claim under Section 113(f)(3)(B), on which Defendant

3  now seeks summary judgment.

4  **II.    LEGAL STANDARDS AND ANALYSIS**

5      **A.    Summary Judgment**

6      Summary judgment is appropriately granted when there are no genuine issues of

7  material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

8  P. 56(c).  The initial burden is on the moving party to show an absence of genuine issues of

9  material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2556  (1986).

10 If the moving party meets its initial burden, then the non-moving party must set forth specific

11 facts showing a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

12 247-48, 106 S. Ct. 2505, 2510 (1986).  In deciding a motion for summary judgment, the

13 Court views the evidence of the non-movant in the light most favorable to that party, and all

14 justifiable inferences are to be drawn in its favor.  *Anderson,* 477 U.S. at 255, 106 S. Ct. at

15 2518.

16     **B.    CERCLA Section 113(f)(3)(B)**

17     Section 113(f)(3)(B) provides that

18     A person who has resolved its liability to the United States or a State

19     for some or all of a response action or for some or all of the costs of

20     such action in an administrative or judicially approved settlement may

21     seek contribution from any person who is not a party to a settlement

22     referred to in [Section 113(f)(2)].

23 42 U.S.C. § 9613(f)(3)(B).  Section 113(f)(2), which is entitled "Settlement," states that

24     A person who has resolved its liability to the United States or a State in

25     an administratively or judicially approved settlement shall not be liable

26     for claims for contribution regarding matters addressed in the

27     settlement.  Such settlement does not discharge any of the other

28

1          potentially liable persons unless its terms so provide, but it reduces the

2          potential liability of the others by the amount of the settlement.

3  42 U.S.C. § 9613(f)(2).

4        The issue before the Court is whether the MOA between Plaintiff and NDEQ satisfies

5  the requirements of Section 113(f)(3)(B) such that Plaintiff may proceed with this

6  contribution action.  This issue, however, can be broken down into at least two subissues.

7  The first is whether a party who seeks to maintain a contribution action under Section

8  113(f)(3)(B) must resolve its *CERCLA* liability in its settlement with the State, as opposed

9  to merely its liability under state law.  As the Court believes the answer is the former, the

10  question then becomes whether the MOA resolves Plaintiff's CERCLA liability.  The second

11  subissue is whether, even assuming that  the MOA need not resolve Plaintiff's CERCLA

12  liability, the MOA constitutes a resolution of Plaintiff's liability under Nebraska law.  While

13  there are other subissues presented, the Court need not reach them in light of its conclusions

14  as to the first two.

15        **1.    Whether Section 113(f)(3)(B) Requires a Settlement that**

16             **Resolves CERCLA Liability**

17        The first issue the Court will address is whether a "settlement" between a "person"[4]

18  and a "State" under Section 113(f)(3)(B) must resolve that person's CERCLA liability, or

19  merely that person's liability under some other source of law.  The Court interprets the statute

20  to require the former.

21        CERCLA authorizes the EPA, in certain circumstances, to enter into settlement

22  agreements with responsible parties for the cleanup of contaminated sites.  *See* 42 U.S.C. §

23  9622.  Such settlements, if they are to be used as a basis for an action under Section

24  113(f)(3)(B),  must conform to certain requirements set forth in the statute.  For example, the

25

26

27  ————————————

28        [4]The parties do not dispute that Plaintiff meets CERCLA's definition of a person.

settlements must contain a covenant not to sue, 42 U.S.C. § 9622(c)(1),[5] and be entered as a consent decree.  *See* 42 U.S.C. § 9622(f)(1)(C) (requiring that, in order for the EPA to grant a covenant not to sue, the party must be "in full compliance with a consent decree under section 9606 of this title").  A PRP that follows these procedures is generally deemed to have fulfilled the requirements of a "settlement" within the meaning of Section 113(f)(3)(B), and may then seek contribution from other PRPs under the same statutory provision.

A state may stand in the shoes of the EPA and conduct certain actions authorized by CERCLA, but only upon application to the EPA.  42 U.S.C. § 9604(d)(1)(A); *W.R. Grace & Co. v. Zotos Int'l, Inc.,* 2005 WL 1076117, at *4 (W.D.N.Y. May 3, 2005).  Following receipt of a state's application, the EPA makes a determination as to whether the state "has the capability to carry out any or all of such actions . . . " *Id.*  If the EPA concludes that a state is so capable, the EPA "may enter into a contract or cooperative agreement with the State . . . to carry out such actions." *Id.*  The terms of such agreements are "subject to the terms and conditions as the President[6] may prescribe."  42 U.S.C. § 9604(d)(1)(B).  One of the powers that the EPA may delegate to a state is the power to enter into settlements.  *W.R. Grace & Co.,* 2005 WL 1076117, at *4.

In other words, a state may enter into a settlement with a PRP that resolves that PRP's CERCLA liability.  It follows logically that a duly-authorized state must follow the same

---

[5]Section 113(f)(3)(B) requires that a settlement resolve liability.  The only way that liability can be resolved under CERCLA is in the form a covenant not to sue.  42 U.S.C. 9622(c)(1) ("Whenever the President has entered into an agreement under this section, the liability to the United States . . . *shall* be limited . . . pursuant to a covenant not to sue in accordance with subsection (f) of this section.") (emphasis added).  While the decision of whether to issue a covenant not to sue falls within the EPA's discretion, *see* 42 U.S.C. § 9622(f)(1), an action under Section 113(f)(3)(B) obviously requires a favorable exercise of that discretion.

[6]While CERCLA authorizes the "President" to enter into settlements, the President has delegated that authority to the EPA Administrator.  *General Time Corp. v. Bulk Materials,* 826 F. Supp. 471, 476 n.8 (M.D. Ga. 1993) (citing *United States v. Cannons Eng'g Corp.,* 899 F.2d 79, 83 n.1 (1st Cir. 1990)).

procedures and meet the same requirements when entering into CERCLA settlements as when the EPA itself is entering into such settlements, as the state is simply the agent of the EPA.  *See* 42 U.S.C. § 9604(d)(1)(A); *W.R. Grace & Co.,* 2005 WL 1076117, at *4.  Of course, a state is not required to seek authorization from the EPA before entering into settlements concerning environmental cleanups, but in that event, the settlement could not be deemed to resolve CERCLA liability.  As such, a party that has not resolved its CERCLA liability leaves itself open to the risk that "the EPA will take later actions or select different remedies that could expose the PRP to additional liabilities."  *Id.* at *5 (citing *State of Ohio v. United States EPA,* 997 F.2d 1520, 1541 (D.C. Cir. 1993)).  This risk is explicitly mentioned in CERCLA's abatement provision:  "[i]n addition to any other action taken by a State or local government . . . [the President] may require the Attorney General of the United States to secure such relief as may be necessary . . . "  42 U.S.C. § 9606(a)); *W.R. Grace & Co.,* 2005 WL 1076117, at *5.

So it is clear that states may enter into settlement agreements concerning environmental cleanups regardless of whether they have received EPA authorization.  The question is whether a settlement *lacking* EPA authorization can serve as a basis for a CERCLA contribution claim under Section 113(f)(3)(B).  The Court believes that it cannot.

In *General Time Corp.,* the district court considered a similar but related issue:  whether a "settlement resolving a party's violation of a state's environmental laws releases a PRP from contribution liability under CERCLA [Section 113(f)(2), which provides contribution protection for parties who have resolved liability "to the United States or the State in an administrative . . . settlement"]."  826 F. Supp. at 475.  The court held that a settlement with a state under state law was insufficient to confer contribution protection, as Congress could not have "intended for settlements effected under a state's environmental statute to confer CERCLA contribution protections."  *Id.* at 476.

The same logic applies in the present context.  Just as to receive CERCLA contribution protection, one must comply with CERCLA settlement procedures and resolve CERCLA liability, to initiate a CERCLA contribution action, one must do the same.  While

a party's agreement with a state agency may, as Defendant points out, resolve that party's state law liability, it has no impact on any of CERCLA's strict procedures and requirements. (Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply") at 9.)  It makes little sense that an agreement with a state agency based on state law without any authorization from federal authorities could serve as a springboard for a CERCLA contribution claim.  This is especially true where Congress has set forth specific guidelines for state involvement in CERCLA enforcement.  As discussed above, before a state can enter into a CERCLA settlement, it must receive authorization from the EPA.  42 U.S.C. § 9604(d)(1)(A).    To allow an agreement between a state and a private entity that lacks EPA backing to serve as a basis for a CERCLA contribution claim would effectively circumvent the requirement that states need to seek authorization from the EPA in order to participate in the CERCLA process.

Courts have employed other rationales to reach the same conclusion.  In *Consolidated Edison,* the Second Circuit looked to SARA's legislative history.  The report of the House Committee on Energy and Commerce accompanying that bill states that Section 113 "clarifies and confirms the right of a person held jointly and severally liable *under CERCLA* to seek contribution from other potentially liable parties."  *Consol. Edison,* 423 F.3d at 96 (quoting H.R. Rep. No. 99-253(I), at 79 (1985), and citing S. Rep. 99-11, at 44 (1985)) (emphasis in *Consol. Edison*).  That case also relied on the fact that a "'response action' is a prerequisite to a Section 113(f)(3)(B) suit - and a 'response action' is a CERCLA-specific term describing an action to clean up a site or minimize the release of contaminants in the future."  *Id.*  (concluding that Section 113(f)(3)(B) "create[s] a contribution right only when liability for CERCLA claims, rather than some broader category of legal claims is resolved."); *City of Waukesha v. Viacom Int'l Inc.,* 2005 WL 3408016, at *2 (E.D. Wis. Oct. 31, 2005) (citing *Consol. Edison,* 423 F.3d at 96).

Other courts that have considered this issue have arrived at the same conclusion.  *Id.* at *2-*6 (denying motion amend complaint to add a Section 113(f)(3)(B) claim where agreement between city and state did not resolve city's CERCLA liability); *Ferguson,* 2005 WL 1869445, at *4 (dismissing Section 113(f)(3)(B) claim on summary judgment where the

1    state agency did not seek permission from the EPA before entering into a settlement with the

2    plaintiff, nor did the state agency assert that it was exercising authority under CERCLA);

3    *W.R. Grace & Co.,* 2005 WL 1076117, at *5 ("Just as a party must be sued under CERCLA

4    before it can maintain a section 113(f)(3)(1) contribution claim, it must settle CERCLA

5    liability before it can maintain a claim under section 113(f)(3)."); *Elementis Chemicals, Inc.*

6    *v. T. H. Agric. and Nutrition, L.L.C.,* 373 F. Supp. 2d 257, 265 (S.D.N.Y. 2005) ("Any person

7    who has settled with . . . a State regarding its CERCLA liability may seek contribution from

8    any other person who has not so settled."); *Pfohl Bros. Landfill Site Steering Comm. v. Allied*

9    *Waste Sys., Inc.,* 255 F. Supp. 2d 134, 152 (W.D.N.Y. 2003) (noting that Section

10   113(f)(3)(B) "authorizes a PRP who has administratively settled its liability *under CERCLA*

11   . . . to seek contribution.") (emphasis added); *Am. Special Risk Ins. Co. v. City of Centerline,*

12   180 F. Supp. 2d 903 (E.D. Mich 2001) (noting that in order to obtain contribution protection

13   under Section 113(f)(2), a party must resolve its CERCLA liability through "an

14   administrative or judicially approved settlement"). *Laidlaw Waste Sys., Inc. v. Mallinckrodt,*

15   *Inc.,* 925 F. Supp. 624, 632-33 (E. D. Mo. 1996). *See, e.g., Cadlerock Props. Joint Venture*

16   *v. Schilberg,* 2005 WL 1683494, at *4 n.3 (D. Conn. July 19, 2005) (expressing doubt that

17   "settlement of state environmental law obligations could . . . be considered equivalent to a

18   judicially-approved federal settlement triggering contribution rights under § 113(f)(3)(B)");

19   *City of Waukesha v. Viacom Int'l, Inc.,* 362 F. Supp. 2d 1025, 1027 (E.D. Wis. 2005)

20   (dismissing Section 113(f)(3)(B) claim where alleged settlement did not resolve the plaintiff's

21   "CERCLA liability" to the state); *Solvent Chemical Co. v. E.I. Dupont De Nemours & Co.,*

22   2005 WL 1523570, at *10 n.9 (W.D.N.Y. June 28, 2005) (acknowledging the holding in

23   *W.R. Grace & Co.*); *CPC Int'l v. Aerojet Gen. Corp.,* 759 F. Supp. 1269, 1283 (W.D. Mich

24   1991) ("Section 113(f)(2) clearly contemplates a settlement over *CERCLA* liability.")

25   (emphasis in original).

26        To the contrary, Plaintiff contends that it is sufficient for purposes of a Section

27   113(f)(3)(B) action that the settlement resolve only the party's liability under state law, and

28   that the specifics of the settlement may be sculpted by the party and the state based on their

1    discretion.  (Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl's Opp'n") at 13.)  In particular,

2    Plaintiff asserts that CERCLA "is crafted to grant states the discretion to settle with liable

3    parties to clean-up contamination property within its boundaries."  (Pl.'s Opp'n at 13.)

4    According to Plaintiff, "CERCLA Section 122 offers *optional* guidance regarding settlements

5    with the EPA and PRPs and outlines liability releases that the government *may* offer as part

6    of a settlement."  (Pl.'s Opp'n at 13) (emphasis in original).

7        The Court believes that Plaintiff is mistaken.  Section 113(f)(3)(B) requires, at a

8    minimum, a resolution of liability.  The United States can only resolve a party's liability by

9    conferring a covenant not to sue.  42 U.S.C. § 9622(c)(1).  A covenant not to sue, in turn, can

10   only be issued if, at a minimum, the requirements set forth in Section 122(f)(1) are met.  42

11   U.S.C. § 9622(f)(1) ("The President may, in his discretion, provide any person with a

12   covenant not to sue concerning any liability to the United States . . . if each of the following

13   conditions is met . . .").  One of those conditions is that "[t]he person is in full compliance

14   with a consent decree under section 9606."  42 U.S.C. § 9622(f)(1)(C).  *See W.R. Grace &*

15   *Co.,* 2005 WL 1076117, at *6.  So while the grant of a covenant not to sue is discretionary,

16   a party that desires to proceed under Section 113(f)(3)(B) with a contribution claim must

17   have prevailed upon the EPA to favorably exercise that discretion.  Even though Plaintiff is

18   correct that certain aspects of EPA settlements with private entities are optional, other

19   aspects, including those required to maintain a Section 113(f)(3)(B) action, are not.  There

20   is no reason to believe that the statutory provisions that bind the EPA when entering into

21   settlement agreements can somehow be circumvented or rendered optional when the EPA

22   delegates its authority to a state government to enter into a settlement agreement.  After all,

23   when a duly-authorized state agency enters into an agreement to settle a PRP's CERCLA

24   liability, the state agency's authority for that agreement derives directly from the applicable

25   portions of Section 122.

26       Thus, the Court reads Section 113(f)(3)(B) to require that any settlement between a

27   "person" and a "State" must settle the person's *CERCLA* liability, not merely its liability

28

1  under state law.  Absent a settlement of CERCLA liability, the person may not proceed with

2  an action under Section 113(f)(3)(B).

3      Accordingly, the appropriate inquiry is whether Plaintiff resolved its CERCLA

4  liability before filing suit against Defendant, or whether the MOA merely purported to

5  resolve liability under Nebraska law.  *See Consol. Edison,* 423 F.3d 90 at 96; *W.R. Grace &*

6  *Co.,* 2005 WL 1076117, at *6.

7          **2.      Whether the MOA and the NFA Letter Resolve Plaintiff's CERCLA**

8                  **Liability**

9      The inquiry now turns to whether the agreement between NDEQ and Plaintiff resolves

10  Plaintiff's CERCLA liability.  For at least three reasons, it does not.

11          **a.      EPA Authorization to Settle CERCLA Liability**

12      There is no evidence in the record that Nebraska obtained the requisite authorization

13  from the EPA to enter into a CERCLA settlement.  *See* 42 U.S.C. § 9604(d)(1)(A).  There

14  was no application to the EPA and there is no evidence of a "contract or cooperative

15  agreement" between Nebraska and the EPA.  *See Cadlerock Props. Joint Venture,* 2005 WL

16  1683494, at *6.  *See, e.g., Abundiz v. Explorer Pipeline Co.,* 2002 WL 663573, at *3 (N.D.

17  Tex. April 19, 2002); *Interfaith Cmty. Org. v. Allied Signal, Inc.,* 928 F. Supp. 1339, 1348

18  (D.N.J. 1996).  The only interaction the State of Nebraska appears to have had with the EPA

19  relating to the Site's remediation was to solicit the EPA's comments on Plaintiff's then-

20  proposed RAWP. (PCSOF, Ex. 20.)  While the EPA issued comments on the plan, this

21  communication alone does not create a triable issue of fact as to the existence of a "contract

22  or cooperative agreement" between Nebraska and the EPA.  Nor does the brief exchange of

23  letters between the Mayor of Omaha and the EPA (PCSOF, Ex. 21, 22), give rise to an

24  inference that the EPA authorized the State of Nebraska to enter into a CERCLA settlement.

25      Plaintiff argues that "NDEQ still had the authority to enforce any . . . federal law or

26  regulation." (Pl.'s Opp'n at 10.)  In support of this statement, Plaintiff cites a paragraph from

27  the MOA, which does not appear to provide any support for Plaintiff's argument.  (Pl.'s

28  Opp'n, citing MOA, ¶ 29.)  The only mention of federal law in that paragraph appears in the

1    following sentence: "This Agreement does not constitute a waiver, suspension, or

2    modification of any requirements of . . . federal law or regulation, which remain in full force

3    and effect." (MOA, ¶ 29). The Court does not construe this sentence as evidence of EPA

4    authorization of the MOA; rather, it appears that this sentence does just the opposite: it

5    confirms that the activities conducted pursuant to the agreement have no impact on Plaintiff's

6    obligations under federal law. As NDEQ lacked authority from the EPA to enter into a

7    CERCLA settlement, the MOA cannot form the basis of a Section 113(f)(3)(B) action.

8    **b.    The Terms of the MOA and the NFA Letter**

9          An examination of the MOA and the NFA Letter only bolsters the conclusion that

10   Plaintiff has not resolved its CERCLA liability. One would expect an agreement purporting

11   to resolve a party's liability under CERCLA to say as much; at a minimum, one would expect

12   the appearance of that acronym in the document. Not so in the MOA or the NFA Letter. The

13   first paragraph of the MOA, which sets forth its statutory basis, lists only Nebraska laws, and

14   makes no reference to federal law generally, CERCLA in particular, or the EPA. (MOA at

15   1.) The Nebraska laws which supply the statutory basis for NDEQ's entrance into the MOA

16   likewise contain no mention of CERCLA. *See* N.R.S. § 81-15, 181, *et seq.,* § 81-1501, *et*

17   *seq.*; *W.R. Grace & Co.,* 2005 WL 1076117, at *5 (noting that "[a] state may settle a PRP's

18   CERCLA liability, assuming it has been delegated that authority to do so, by entering into

19   an administrative settlement (monetary settlement pursuant to section 122(g) or (h)) or a

20   judicially approved settlement (cleanup settlement pursuant to section 122(d)(1)(A))."); *City*

21   *of Waukesha,* 2005 WL 3408016, at *3.

22         More particularly, one would expect an agreement which purported to resolve a

23   party's CERCLA liability to reveal as much in the "intent" or "objective" sections. Not here.

24   The "intent" of the MOA is to allow Plaintiff to implement its work plan with oversight from

25   NDEQ (MOA, ¶ 9); the "objective" of the MOA is "to protect public health and welfare and

26   the environment from releases or threatened releases of pollutants from the Site" (MOA, ¶

27   11.) CERCLA does not appear in either of these provisions.

28

1       Moreover, the MOA requires Plaintiff "to perform all work conducted pursuant to this

2  Agreement and any approved Work Plans in accordance with the requirements of applicable

3  *state* laws and regulations." (MOA, ¶ 17) (emphasis added).  The MOA does not suggest that

4  the parties rely on or seek guidance from any federal laws, including CERCLA. *W.R. Grace*

5  *& Co.,* 2005 WL 1076117, at *7 ("The . . . Consent Order does not state that the [state

6  agency] was exercising authority under CERCLA, does not indicate that the EPA concurred

7  with the remedy selected and does not provide a release as to any CERCLA claims.  In fact

8  the . . . Consent Order makes no mention of CERCLA at all."); *City of Waukesha,* 2005 WL

9  3408016, at *3.

10       Also, the Agreement explicitly states that it "does not constitute a waiver, suspension,

11  or modification of any requirements of . . . federal law or regulation, which remain in full

12  force and effect[,] . . . except as may be provided by the issuance of the No Further Action

13  letter."  (MOA, ¶ 29.)  The NFA Letter, as mentioned above, does not even mention

14  CERCLA, federal law, or the EPA.  (PCSOF, Ex. 3.)

15       Further, the only mention of federal law in the MOA, aside from the phrase mentioned

16  in the previous paragraph, states that "[t]he Work Plan shall demonstrate how these activities

17  will conform with federal [EPA] standards."  (MOA, ¶ 13(a).)  There is no evidence,

18  however, that NDEQ made a determination that the RRAWP conformed with EPA standards,

19  nor does RAPMA require NDEQ to have done so.  *See* N.R.S. § 81-15, 184.  Accordingly,

20  this phrase, by itself, does not evidence EPA authorization of the MOA.

21       Extrinsic evidence also supports the conclusion that the MOA did not resolve

22  Plaintiff's CERCLA liability.  As Defendant's reply brief points out, in the "Public Comment

23  and [NDEQ] Response to the [Site]", NDEQ notes that "[s]ince the Asarco site is not a

24  federal Superfund site and is not being addressed under the provisions of the Superfund law,

25  contribution protection and covenants not to sue are probably not available." (Def.'s Reply

26  at 8, citing PCSOF, Ex. 8 at 19.)  In the same public comment session, NDEQ noted that the

27  NFA Letter that it may issue to Plaintiff "has no binding effect on EPA." (PCSOF, Ex. 8 at

28  19.)

1

### c.    CERCLA Settlement Procedures

2          As discussed above, a CERCLA settlement must contain a covenant not to sue and

3   be entered as a consent decree in the appropriate United States District Court.  42 U.S.C.

4   9622(c)(1), (f)(1)(C).  The parties do not appear to dispute that these requirements must be

5   satisfied in CERCLA settlements between the EPA and PRPs.  There is disagreement as to

6   whether settlements between state agencies and PRPs must also fulfill these requirements.

7          Plaintiff's argument, which was discussed above, is that CERCLA leaves it to the

8   states and the parties to work out the details of their settlements, providing only "optional

9   guidance."  (Pl.'s Opp'n at 13).  The Court is unpersuaded by Plaintiff's argument, as the

10  relevant provisions of Section 122 appear to be mandatory.  A Section 113(f)(3)(B) claim

11  requires a resolution of liability; the only way the United States can resolve liability is

12  through a covenant not to sue, 42 U.S.C. § 9622(c)(1), and a covenant not to sue requires

13  compliance with a consent decree, 42 U.S.C. § 9622(f)(1)(C).  *W.R. Grace & Co.,* 2005 WL

14  1076117, at *6.  These requirements bind the EPA, and by extension, they bind states that

15  have received EPA authorization.  As mentioned above, it is inconceivable that the binding

16  nature of CERCLA's settlement requirements can somehow be altered through the process

17  of delegating the authority to enter into those settlements to states.  The MOA's departure

18  from these procedures is another reason that it cannot serve as a basis for a Section

19  113(f)(3)(B) claim.  *Id.*

20         As Defendant points out, Plaintiff is obviously well aware of the distinction between

21  a memorandum of agreement governed by state law and a consent judgment, as Plaintiff

22  entered into a consent judgment just before the time it was contemplated cleaning up the Site.

23  (Def.'s Reply at 6, citing Supplemental Statement of Facts in Supp. of Def.'s Reply

24  ("DSSOF"), Ex. A.)  That consent judgment was entered before the United States District

25  Court in the Western District of Washington, and, among other things, provided Plaintiff

26  with a covenant not to sue.  (DSSOF, Ex. A.)

27

28

1    In sum, the Court is convinced that, as a matter of law, the MOA does not resolve

2    Plaintiff's CERCLA liability.  Accordingly, Plaintiff is not entitled to maintain an action

3    under Section 113(f)(3)(B).

4         **3.        Whether the MOA Resolves Plaintiff's Liability to the State of**

5              **Nebraska**

6    Assuming that Section 113(f)(3)(B) does not require that a settlement with the State

7    resolve CERCLA liability, the Court turns to the question of whether the MOA and the NFA

8    Letter that it incorporates by reference resolves Plaintiff's liability under Nebraska law.

9    They do not.  The MOA explicitly states that it does not waive any liability, except

10   as provided in the NFA Letter.  (MOA, ¶ 29).  The NFA Letter, in turn, does not state that

11   it waives any of Plaintiff's liability. PCSOF, Ex. 3 at 2.)  Rather, it simply says that Plaintiff

12   has completed its obligations under the MOA, and that, at the present time, no further action

13   is required.  If the parties had truly meant for the issuance of the NFA Letter to constitute a

14   waiver of liability, they could have easily said as much.  Clearly, they were familiar with the

15   use of terms such as "waiver" and "release," as the parties employed those terms in the MOA.

16   If the intent of the parties was to effectuate a waiver and release of all future claims that the

17   State of Nebraska may have against Plaintiff relating to the Site, the terms of the MOA or the

18   NFA Letter would have said as much.

19   In similar cases, parties seeking waivers or releases of liability took care that those

20   terms appeared in the relevant agreement.  For example, in *Consolidated Edison,* even

21   though the court ultimately concluded that an agreement between the state and the PRP did

22   not trigger an action under Section 113(f)(3)(B) because of the absence of a waiver of

23   CERCLA liability, the terms of the agreement are instructive nonetheless for the language

24   that the parties used to waive the plaintiff's liability under state law: "[the New York State

25   Department of Environmental Conservation] releases, covenants not to sue, and shall

26   forebear from bringing any action, proceeding, or suit pursuant to [various New York

27   environmental protection statutes], and from referring to the Attorney General any claim for

28   recovery of costs incurred by the Department . . . for the further investigation and

1    remediation of the Site, based on the release or threatened release of Covered

2    Contamination." *Consol. Edison,* 423 F.3d at 96.  The consent order at issue in *W.R. Grace*

3    *& Co.*, while also deficient in its failure to include a waiver of CERCLA liability, similarly

4    employs unequivocal language about the nature of the liability waiver: "If the [New York

5    State Department of Environmental Conservation] acknowledges that the implementation is

6    complete and in accordance with the Approved Remedial Design, then . . . such

7    acknowledgment shall constitute a full and complete satisfaction and release of each and

8    every claim, demand, remedy or action whatsoever against [the plaintiff], which the

9    Department has or may have as of the date of such acknowledgment . . . . " *W.R. Grace &*

10   *Co.,* 2005 WL 1076117, at *7.  *See also City of Waukesha,* 362 F. Supp. 2d at 1027 (denying

11   permission to amend complaint to include a Section 113(f)(3)(B) claim where, among other

12   reasons, parties had not signed an administrative settlement agreement that "explicitly

13   resolves [the plaintiff's] liability to the State under state law and CERCLA); *City of*

14   *Waukesha,* 2005 WL 3408016, at *3 (citing agreement between city and state where "[the

15   state] covenants not to sue [the plaintiff]").

16          Other language in the MOA and the NFA Letter further underscores the conclusion

17   that those documents did not resolve Plaintiff's liability under state law.  According to the

18   MOA and the NFA Letter, the promise of no further action is contingent upon, among other

19   things, the actions of the City of Omaha.  (MOA, ¶ 32, PCSOF, Ex. 3.)  If at any point, for

20   example, the City of Omaha fails to enforce "adequate institutional controls for the Site" or

21   "fails to maintain the Site for its designated use," (PCSOF, Ex. 3) then all bets are off:  the

22   letter "may be rescinded" and Plaintiff can still be held liable to the State of Nebraska for

23   additional cleanup of the property.  The fact that the parties employed the term "rescission"

24   is significant, as when a contract is rescinded, it is "void[ed], repeal[ed], or annul[ed]."

25   *Black's Law Dictionary* 1308 (7th ed. 1999).  It cannot be said that any of Plaintiff's liability

26   to the state was "resolved" if the legal effect of all of its actions can be voided at any point

27   in the future by the actions of a third party, the City of Omaha.

28

1      Plaintiff argues that model orders issued by the EPA, such as the EPA Revised Model

2   Administrative Order on Consent for Removal Actions, the EPA Revised Model

3   Administrative Order on Consent for Remedial Design, and the EPA Revised Model

4   Administrative Order on Consent for Remedial Investigation and Feasibility Study, contain

5   "reopeners" or "reservations of rights" provisions that are similar to those contained in the

6   NFA Letter.  (Pl.'s Opp'n at 8, citing  PCSOF, Ex. 10.)  In particular, Plaintiff cites a Revised

7   Model Administrative Order on Consent for Removal of Actions issued by the EPA in 2001,

8   which, according to Plaintiff, "permits the EPA to commence removal actions as follows"

9   (Pl.'s Opp'n at 8, citing PCSOF, Ex. 10):

10          If EPA determines that additional removal actions not included in an

11          approved plan are necessary to protect public health, welfare, or the

12          environment, EPA will notify Respondents of that determination.

13          Unless otherwise stated by EPA, within 30 days of receipt of notice

14          from EPA that additional removal actions are necessary to protect

15          public health, welfare or the environment, Respondents shall submit for

16          approval by EPA a Work Plan for the additional removal actions.

17   (PCSOF, Ex. 10).

18      Plaintiff's argument overlooks the fact that there is no dispute as to whether valid

19   CERCLA settlements can contain "reopener" clauses or "reservation of rights" provisions.

20   (Def.'s Reply at 10.)  What is in dispute is whether NDEQ's promise of no further action

21   except in certain enumerated circumstances constitutes even a partial resolution of Plaintiff's

22   liability to Nebraska.  Even in the EPA Model Order cited by Plaintiff, there is a "covenant

23   not to sue by EPA," though Plaintiff failed to include the text of that covenant as part of its

24   exhibit.  (PCSOF, Ex. 10 at 2.)  The existence of this covenant not to sue, or a substantive

25   equivalent, is a necessary condition for a Section 113(f)(3)(B) claim, a condition which, in

26   the present action, is lacking.

27      Relatedly, the Court does not view the provisions of the NFA Letter relating to the

28   City of Omaha as akin to the "reservation of rights" or "reopener" language contained in the

1   model orders cited by Plaintiff.  The "reservation of rights" and "reopener" language from

2   those orders permits the EPA to take additional action against the other party to the

3   settlement in the event that additional contamination is found on the property that poses a

4   threat to "public health, welfare or the environment."  (Pl.'s Opp'n at 8.)

5          However, the language pertaining to the City of Omaha is of an entirely different ilk.

6   It nullifies the promise of no further action by NDEQ for reasons completely unrelated to a

7   finding of additional contamination - as mentioned above, for example, NDEQ can take

8   action against Plaintiff if, years down the road, the City of Omaha fails to enforce

9   institutional controls for the Site or alters its use.  This language, even assuming it can be

10  properly described as a "reservation of rights" or "reopener" clause, is of a fundamentally

11  different character  than that contained in the EPA's model orders.  The decision by NDEQ

12  and Plaintiff to include this language only strengthens the conclusion that the parties did not

13  intend for their agreement to settle Plaintiff's liability to the state.

14         Plaintiff also argues that "[a] binding promise to provide a release upon the occurrence

15  of a specific future event is no different than a release given at a later date."  (Pl.'s Opp'n at

16  11.)  Maybe so, but the NFA Letter did not provide a release.  As discussed above, the NFA

17  provided a rescindable promise that, barring various contingencies, including the actions of

18  a third party, NDEQ would take no further action.  The Court views this contingent promise

19  as materially different from the waivers and releases of liability at issue in *Consolidated

20  Edison, W.R. Grace & Co.,* and similar cases.

21         Plaintiff does not cite a single case where a court has construed a promise of no

22  further action by a state agency as a settlement of liability within the meaning of Section

23  113(f)(3)(B).  In the only case the Court has found dealing with the legal effect of a no

24  further action letter, the district court found that the letter did not waive the private entity's

25  liability.  In *Ferguson v. Aracta Redwood Company,* the district court considered, among

26  other issues, whether summary judgment was appropriate on the plaintiff's Section

27  113(f)(3)(B) claim.  2005 WL 1869445, at *5.  While the court's opinion is somewhat sparse

28  on the facts, it appears that the plaintiff, who owned the property, performed an

environmental cleanup, and during that time, had certain interactions with the California Regional Water Quality Control Board ("CRWQCB") and federal agencies concerning the cleanup. *Id.* The plaintiff tried to persuade the court that those interactions constituted an "administrative settlement" within the meaning of Section 113(f)(3)(B). In support of that argument, the plaintiff offered a letter from CRWQCB which stated that "this agency finds that no further action on this site is required." *Id.* The court concluded that the plaintiff had not achieved a settlement, "nor did the EPA endorse the statement." *Id.* While it is unclear whether this "no further action" letter played a dispositive or even significant role in the district court's decision, the court clearly did not view that letter as a release of any liability, whether it be under state or federal law.

Other considerations militate against a finding that the NFA Letter and the MOA resolved Plaintiff's liability to NDEQ. First, RAPMA, one of the Nebraska laws that authorized NDEQ to enter into the MOA and issue the NFA Letter does not permit Nebraska state agencies to enter into agreements waiving the liability of parties that successfully implement a remedial action plan with agency oversight. All that is permitted is the issuance of an NFA letter. One can only assume that the Nebraska legislature, had it intended to permit its state agencies to sign waivers or releases of liability in this context to have said as much. The legislature's silence on this issue further weakens Plaintiff's position.

Also, neither the MOA nor the NFA Letter contain the word "settlement," a fact that other courts have found probative on the issue of whether a particular agreement constitutes a "settlement" within the meaning of Section 113(f)(3)(B). *Arcata,* 2005 WL 1869445, at *5; *Pharmacia Corp. v. Clayton Chem. Acquisition LLC,* 2005 WL 615755, at *7 (S.D. Ill. March 8, 2005).

Finally, a letter written by one of Plaintiff's lawyers in connection with another environmental cleanup highlights the distinction between the legal effect of a no further

action letter and a covenant not to sue.[7]  (Def.'s Reply, Ex. B.)  That letter, which discusses Plaintiff's cleanup of a different site at which Plaintiff was to receive a covenant not to sue from the EPA as a part of a settlement which was to be entered as a consent decree, states,

> The terms of the consent decree give all involved parties a relatively high degree of certainty about future liability issues, although the decree is by no means a guarantee that further environmental liabilities will not arise at the site.  This regulatory situation is very different from participation in a voluntary remediation program such as Nebraska's [RAPMA] program, where an applicant does not receive a covenant not to sue or other release of liability from the State of Nebraska or the United States.

(Def.'s Reply, Ex. B.)

The Court concludes that, as a matter of law, the combination of the MOA and the NFA Letter did not resolve any of Plaintiff's liability under Nebraska law.  Therefore, Plaintiff is not entitled to proceed with its Section 113(f)(3)(B) claim.

**3.     Public Policy**

Plaintiff makes the argument that dismissal of this action would "discourage voluntary cleanup and is against public policy," as it would leave Plaintiff without a remedy for recouping its cleanup costs  (Pl.'s Opp'n at 14.)  Defendant responds that, "[W]hen the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms."  (Def.'s Reply at 11, citing *Dodd v. United States,* 125 S. Ct. 2478, 2483 (2005)).  According to Defendant, the language of Section 113(f)(3)(B) is plain, and a literal application of that language would not produce an absurd result, as it makes perfect sense to require a party that seeks to

---

[7]Interestingly but not surprisingly, the letter was written in 1997, well before the Supreme Court's decision in *Aviall.*

1   maintain a CERCLA action to have settled, at least in part, its CERCLA liability to the
2   United States.  (Def.'s Reply at 11.)

3   The Court finds itself in agreement with Defendant.  First, the CERCLA provisions
4   at issue are relatively clear, and the requirement that a party settle CERCLA liability before
5   commencing a CERCLA contribution action does not appear absurd.  Second, the Court is
6   not convinced that similarly-situated plaintiffs lack a remedy under CERCLA law, even after
7   *Cooper Industries*, to force other responsible parties to pay for their fair share of the cleanup.
8   *See, e.g., Aggio,* 2005 WL 2277037, at *5-6; *Koutrous,* 2005 WL 1869445.  Third, the Court
9   does not feel that its ruling will undermine the incentives to undertake voluntary cleanups,
10  as nothing prevents a party from pursuing its state law remedies to seek contribution from
11  other potentially responsible parties.

12  **4.    Other issues**

13  Defendant has raised other arguments in its brief as to why it believes that the MOA
14  and the NFA Letter do not constitute a settlement within the meaning of Section
15  113(f)(3)(B).  Those arguments include the fact that the MOA was allegedly not binding on
16  either of the parties, and the fact that the MOA was allegedly not subject to the requisite
17  degree of public review.  The Court feels that it in light of its conclusions above, it need not
18  render an opinion about those arguments.

19  **III.    CONCLUSION**

20  The Court interprets Section 113(f)(3)(B) to require that a party seeking to maintain
21  a contribution action under this section have entered into a settlement resolving its *CERCLA*
22  liability.  The MOA between Plaintiff and NDEQ did not resolve Plaintiff's CERCLA
23  liability, and therefore, it cannot serve as a basis for a Section 113(f)(3)(B) action.
24  Moreover, even assuming that Section 113(f)(3)(B) does not require a CERCLA settlement,
25  but merely a settlement of Plaintiff's liability under some other source of law, Plaintiff still
26  cannot maintain a Section 113(f)(3)(B) action because the MOA did not resolve Plaintiff's
27  liability to the State of Nebraska.  As these conclusions were based on facts about which
28  there is no dispute between the parties, Defendant is entitled to summary judgment.

1      **IT IS ORDERED** granting Defendant Union Pacific Railroad Company's Motion for

2  Summary Judgment (Doc. 27).

3      **IT IS FURTHER ORDERED** directing the Clerk to enter Judgment in favor of

4  Defendant dismissing Plaintiff's claims.

5

6      DATED this 24th day of January, 2006.

7

8

9  _____

10                    Susan R. Bolton
                 United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28